UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CHARLES J. BROWN,
   Plaintiff,

vs.               Case No. 07-2209

DAVID GRIFFET, THOMAS PETRILLI,
DENNIS BALTZELL, RODNEY MITCHELL,
MATTHEW CRANE, DOUGLAS KIMME, and
JAMIE BOWERSOCK,
   Defendants.

## MEMORANDUM OPINION AND ORDER

  Before the court are Defendants' summary judgment motion [38], Plaintiff's response [42] and Defendants' reply [43].

### Standard

  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

  "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at

trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

Background

Plaintiff Charles J. Brown has filed a Complaint against all of the Defendants alleging excessive force, failure to intervene and deliberate indifference to a serious medical need in connection with his arrest for home invasion/robbery on August 3, 2007. In his amended complaint, the plaintiff claims he suffered injuries to his ribs.

The Defendants assert that they are each entitled to qualified immunity because Plaintiff's constitutional rights were not violated and the officers' actions were objectively reasonable under the difficult and dangerous circumstances in which they confronted Plaintiff. Further, Defendants assert that, in addition, there is no objective evidence of Plaintiff suffering an injury or having serious medical needs.

Undisputed Material Facts

**A. Plaintiff's Amended Complaint**

1. On the night of his arrest, Plaintiff Charles J. Brown alleges that Defendant David Griffet was serving a search warrant at 1608 Williamsburg Drive, Champaign, Illinois, but Plaintiff decided to hide in the attic while the officers searched for him "for about 1 ½ hours." (Amended Complaint, Statement of Claim, p. 4 [27])
2. "One of the officers shot some mace or pepper spray up into the attic several times at [Plaintiff] [s]o [Plaintiff] decided to come down because [his] eyes were burning and [he] could not see." *Id*. Also, he could not breathe. Id.
3. "There was not any stairs for [Plaintiff] to use, so [he] just fell from the attic to the floor below" and after landing Plaintiff tried to cover himself. Id.
4. While falling from the attic, Plaintiff pulled a Christmas tree with him. Id.

**B. Plaintiff's Deposition Testimony[1]**

---

[1]Exhibits can be found attached to summary judgment motion [38].

5. Plaintiff is currently incarcerated at the Vienna Correctional Center due to a felony robbery conviction. He was arrested for this offense on August 3, 2007, which resulted in the claims he asserts in this case. (pp. 4 & 11, Exhibit 1, deposition transcript of Plaintiff Charles Brown)
6. The day before his arrest, on August 2, 2007, the Champaign police looked for Plaintiff at 1608 Williamsburg but he fled. (p. 12, Ex. 1)
7. On the day of his arrest, Plaintiff was inside the house at 1608 Williamsburg when the police arrived and he decided to hide in the attic. (p. 13, Ex. 1)
8. The house has a basement and first floor with the attic being above the first floor. Id.
9. There were no stairs leading into the attic so Plaintiff jumped up there. (p. 14, Ex. 1) The attic is above a hallway. Id.
10. When the officers arrived at 1608 Williamsburg, they announced that they were police officers. (p. 17, Ex. 1)
11. The police officers ultimately came into the house after Plaintiff went into the attic but a long time had elapsed before the police did so. (p. 18, Ex. 1)
12. Plaintiff spent at least two hours in the attic. (pp. 19, 24-25, Ex. 1) It was dark in the attic and Plaintiff could not see. (p. 20, Ex. 1)
13. When Plaintiff went into the attic, he covered the hole to the attic. (p. 27, Ex. 1)
14. While Plaintiff was in the attic, he heard the police officers tell him to come down. (p. 25, Ex. 1)
15. On several occasions, Plaintiff saw officers stick their head through the hole to the attic. (p. 25, Ex. 1)
16. Plaintiff heard an officer say he was from the Champaign Police Department and he heard the officers say they had a search warrant. (p. 26, Ex. 1)
17. Pepper spray was later sprayed into the attic. (p. 27, Ex. 1)
18. Plaintiff could not see after the pepper spray was activated and Plaintiff decided to exit the attic due to burning of his eyes and skin. (pp. 28-29, Ex. 1)
19. Plaintiff came out of the attic feet first. (p. 30, Ex. 1)
20. Plaintiff, however, had been asked by the officers to come to the attic opening with his hands showing. (pp. 86-87, Ex. 1)
21. When Plaintiff came through the attic hole, he pulled down limbs from an artificial Christmas tree and fell on it. (pp. 30 & 40, Ex. 1) Plaintiff also says he tried to pull himself back into the attic. (p. 29, Ex. 1)
22. There were several police officers by the opening of the attic when Plaintiff came out feet first. (p. 30, Ex. 1) He does not know who they were because he had mace in his eyes and could not see. (p. 22, Ex. 1)
23. Ultimately, Plaintiff hit the ground and he was handcuffed. (p. 34, Ex. 1)
24. Plaintiff cannot name an officer who made contact with him (p. 34, Ex. 1), because his eyes were burning and he could not see. (pp. 34 & 36, Ex. 1)
25. It took more than one police officer to handcuff Plaintiff. (p. 35, Ex. 1) Plaintiff was handcuffed by having his hands placed behind his back. Id.
26. Everything happened quickly and Plaintiff was handcuffed within a few seconds after he went through the attic hole. (p. 34, Ex. 1)
27. When Plaintiff was handcuffed, there were officers all over him, but Plaintiff felt no

further physical contact more than a second after he was handcuffed. (p. 37, Ex. 1)
28. After Plaintiff was handcuffed, he was brought outside the house within five minutes. (p. 38, Ex. 1)
29. Plaintiff was walked directly out the front door of the house at 1608 Williamsburg to a squad car on the street. (p. 42, Ex. 1)
30. Plaintiff was able to walk from the house to the squad car. (p. 68, Ex. 1)
31. After Plaintiff was brought outside of the house, Sgt. David Griffet wiped the OC spray off Plaintiff's face. (p. 38, Ex. 1) Plaintiff was placed inside a police car. (p. 39, Ex. 1)
32. Plaintiff was immediately taken to the Champaign police station downtown by only stayed there for a few minutes because he refused to be interviewed by Detective Don Shephard. (pp. 42-44, Ex. 1)
33. Plaintiff did not ask Detective Shepard for medical attention. (p. 44, Ex. 1)
34. Plaintiff was then taken from the Champaign police station to the Champaign County satellite jail in Urbana. (pp. 44-45, Ex. 1)
35. When Plaintiff got to the Champaign County satellite jail, he was taken to the sallyport at which time his eyes were open and he could see well. (p. 45, Ex. 1)
36. Once Plaintiff got to the sallyport at the jail, the Champaign County sheriff's personnel took over and booked him. (p. 46, Ex. 1)
37. At the county jail, Plaintiff was interviewed by Deputy Sheriff Brenda Richards. (pp. 70-71, Ex. 1)
38. Plaintiff has no knowledge of having any bruises at the time that he was interviewed by Deputy Richards and cannot remember where he was bleeding. (p. 71, Ex. 1)
39. While incarcerated at the Champaign County Jail, Plaintiff did not see a medical doctor. (p. 56, Ex. 1)
40. Plaintiff has never treated by any medical doctor for any of the alleged injuries in this case. (p. 58, Ex. 1)
41. Plaintiff has never had any x-rays taken of his ribs. (pp. 49-50, Ex. 1)
42. Plaintiff has never had any diagnostic studies done in connection with alleged injuries in this case. (p. 58, Ex. 1)
43. Plaintiff has not incurred any medical expenses due to alleged injuries in this case. (p. 59, Ex. 1)
44. Plaintiff has no photographs depicting any injuries. (p. 76, Ex. 1)
45. When Plaintiff was admitted to the Vienna Correctional Center on August 15, 2008 (more than 1 year after his arrest) he was asked questions by either a nurse or a doctor, but did not make any physical complaints at that time. (p. 80, Ex. 1)
46. During his deposition, Plaintiff refused to answer the question of how the Champaign police officers should have handled things differently when he was arrested. (p. 84, Ex. 1)

**C. Plaintiff's Response to Request to Admit Facts and Genuineness of Documents**

47. On July 29, 2008, Plaintiff was convicted for robbery in Champaign County case #07-CF-1332 and was sentenced to seven years of incarceration in the Illinois Department of Corrections. (¶¶ 1-2, Request to Admit Facts, Exhibit 2; and ¶¶ 1-2, Response to Request

4

to Admit Facts, Exhibit 3)
48. If Dr. Richard Ibe were called as a witness in this case, he would testify that he saw Charles J. Brown on August 15, 2008 and that Plaintiff appeared with appropriate affect and mood and did not appear to require mental health services at that time. (¶¶ 9-10, Exhibits 2 & 3)

**D. Affidavit of David Griffet**

49. Defendant David Griffet is a Sergeant with the City of Champaign Police Department and during August 2007 was assigned to the Garden Hills neighborhood of Champaign which includes the house at 1608 Williamsburg Drive. (pp. 2-3, Exhibit 4, Affidavit of David Griffet)
50. On August 2, 2007, Griffet was told by Lieutenant Scott Swan of the Champaign Police Department that Plaintiff and another person had been identified as suspects in a recent home invasion and Griffet was directed to arrest Plaintiff. (¶ 4-5, Ex. 4)
51. On August 2, 2007 Griffet and another police officer arrived at 1608 Williamsburg which was a known residence for Plaintiff and upon his arrival he noticed Plaintiff with a group of approximately 15 other persons standing in the driveway. (¶ 6-7, Ex. 4)
52. Plaintiff, upon seeing Griffet, entered the house and shortly thereafter left the house through the back door and ran away. (¶ 7, Ex. 4)
53. The next day, on August 3, 2007, at approximately 7:50 p.m. it was reported to Griffet that a citizen had seen Plaintiff at 1608 Williamsburg and upon Griffet's arrival at that location he was told by a woman who purported to be Plaintiff's wife that Plaintiff was inside the house. (¶ 8, Ex. 4)
54. In response to the information Griffet received from Plaintiff's wife, he knocked on the door and yelled to Plaintiff, but there was no response and Plaintiff did not come out of the house. (¶ 9, Ex. 4)
55. Because Plaintiff did not come out of the house, Griffet returned to the Champaign police station where he prepared a complaint and affidavit for a search warrant for 1608 Williamsburg Drive. (¶ 10, Ex. 4)
56. Champaign County Circuit Court Judge Jeffrey Ford issued a search warrant for the house at approximately 9:05 p.m. on August 3, 2007. (¶ 10, Ex. 4)
57. After issuance of the search warrant, Griffet returned to 1608 Williamsburg. (¶ 11, Ex. 4)
58. At approximately 9:30 p.m., the search warrant was executed and Griffet entered the house. (¶ 12, Ex. 4)
59. While searching the house, Griffet encountered Scott Clark, a suspect in an unrelated matter, who was then arrested. (¶ 13, Ex. 4)
60. During the search of the house, other officers determined that Plaintiff was hiding in the attic. (¶ 14, Ex. 4)
61. Griffet, however, left the house prior to Plaintiff coming out of the attic and prior to Plaintiff being arrested. (¶ 15, Ex. 4) Once Griffet went outside he did not see Plaintiff until Plaintiff exited the house in handcuffs. (Id.)
62. Once Plaintiff was escorted outside of the house, he was placed into Officer Mark McCabe's squad car where Griffet used two Sudecom wipes to decontaminate the pepper

5

spray from Plaintiff's eyes and face. (¶ 16, Ex. 4) Officer McCabe transported Plaintiff to the Champaign police station. (¶ 17, Ex. 4)

63. Officers Jamie Bowersock and John Lieb later transported Plaintiff from the Champaign police station to the Champaign County satellite jail on Lierman Road in Urbana. (¶ 18, Ex. 1)
64. Griffet was not inside the house at 1608 Williamsburg when Plaintiff exited the attic and he was not involved in the physical arrest of Brown. (¶ 19, Ex. 4)
65. At no time did Griffet touch Plaintiff other than to decontaminate the pepper spray from Plaintiff's eyes and face. (¶ 20, Ex. 1)
66. Griffet had no reason to believe that Plaintiff required medical attention. (¶21, Ex. 4)

**E. Affidavit of Dennis Baltzell**

67. Defendant, Dennis Baltzell, is a sergeant with the Champaign Police Department and was asked by Sgt. Matthew Crane to assist in connection with service of the search warrant at 1608 Williamsburg at approximately 9:01 p.m. on August 3, 2007. (¶ 1-2, Exhibit 5, Affidavit of Dennis Baltzell)
68. When Sgt. Baltzell arrived at the house, he learned that Plaintiff was hiding inside the house and was wanted on a home invasion charge. (¶ 4, Ex. 5)
69. Before entering the house, Sgt. Crane announced the presence of the officers and repeatedly said "Champaign Police". (¶ 6, Ex. 5)
70. Sgt. Baltzell and the other officers determined that Plaintiff was in the attic and they opened the attic door to get a better view. (¶ 8, Ex. 5)
71. The officers at the scene repeatedly ordered Plaintiff to come out of the attic, but they received no response. (¶ 9, Ex. 5)
72. Next, Officer Brad Krauel brought a mirror and additional equipment to the scene in an attempt to see if Plaintiff was in the attic, but the use of the mirror was not helpful in locating Plaintiff. (¶ 10, Ex. 5)
73. Sgt. Matthew Crane then deployed OC spray into the attic, but Plaintiff still refused to come down. (¶ 11, Ex. 5)
74. After deploying the OC spray, it was decided that Sgt. Baltzell and Officer Rodney Mitchell would climb portable ladders which had been brought to the scene and were placed below the attic hole. (¶ 12, Ex. 5)
75. Officer Mitchell climbed one ladder to provide cover for Sgt. Baltzell who climbed another ladder holding a can of pepper spray. (¶ 13, Ex. 5)
76. Sgt. Baltzell and Officer Mitchell were both wearing protective gas masks. Id.
77. Once Sgt. Baltzell could see into the attic, he observed that Plaintiff crawling farther away from the opening and trying to hide so he sprayed pepper spray at Plaintiff. (¶ 14, Ex. 5)
78. As a result of Sgt. Baltzell spraying pepper spray, Plaintiff scrambled towards him feet first, kicking items in his direction, including fake Christmas tree branches. (¶ 14, Ex. 5)
79. Very quickly, Plaintiff was at the opening to the attic and trying to get out before Sgt. Baltzell could climb down his ladder. (¶ 15, Ex. 5)
80. Sgt. Baltzell attempted to warn the officers standing below what was happening, but ultimately Officer Mitchell and Plaintiff fell to the floor. (¶ 16, Ex. 5)

81. When Plaintiff came out of the attic, Sgt. Crane caught Sgt. Baltzell to prevent him from falling to the floor from his ladder. (¶ 17, Ex. 5)
82. Once Plaintiff fell to the floor he began struggling with the officers below, all of whom were in a narrow hallway below the attic hole. Ultimately, Officer Thomas Petrilli was able to secure Plaintiff in handcuffs. (¶¶ 18-19, Ex. 5)
83. Sgt. Baltzell did not see any officers use unreasonable force and he Plaintiff was not punched or kicked (¶ 20, Ex. 5) Baltzell had no reason to believe Plaintiff needed medical attention. (¶ 21, Ex. 5)

**F. Affidavit of Rodney Mitchell**

84. Defendant, Rodney Mitchell, was a Champaign Police officer on August 3, 2007 at which time he was called to the house at 1608 Williamsburg to search for Plaintiff, a home invasion/robbery suspect. (¶¶ 2-3, Exhibit 6, Affidavit of Rodney Mitchell)
85. After a search of the residence was completed, Officer Mitchell was told by other officers that Plaintiff was hiding in the attic. (¶ 4, Ex. 6)
86. After the officers opened the attic door, numerous warnings were given to Plaintiff to come down before OC spray was used. (¶ 5, Ex. 6)
87. Eventually, pepper balls were launched into the attic. (¶ 6, Ex. 6)
88. Further commands were given for Plaintiff to come down, but there was no response even though coughing could be heard in the attic. (¶ 7, Ex. 6)
89. Additional OC was sprayed into the attic and further coughing was heard. (¶ 8, Ex. 6)
90. Portable ladders were brought to the scene. Using a portable ladder, Officer Mitchell looked into the attic and saw Plaintiff moving around and he appeared to be hiding under a pile of clothes. (¶¶ 9-10, Ex. 6)
91. Plaintiff was again told to come out of the attic and more OC was sprayed into the attic. (¶¶ 11-13, Ex. 6)
92. Sgt. Matthew Crane then told Officer Mitchell and Sgt. Baltzell to enter the attic and get to Plaintiff by using their folding/portable ladders. (¶ 14, Ex. 6)
93. At that time, all of the officers in the house were wearing protective masks. (¶ 15, Ex. 6)
94. When Officer Mitchell and Sgt. Baltzell started to climb the ladders, Mitchell observed Plaintiff get up and move away from them. (¶ 16, Ex. 6)
95. Plaintiff then mumbled something and lunged towards Sgt. Baltzell, feet first, coming out of the attic hole. (¶ 18, Ex. 6)
96. At that time, Officer Mitchell and Sgt. Baltzell had their upper torsos in the attic hole and when Plaintiff came through the hole he did so along with debris from the attic which caused Mitchell and Baltzell to lose their balance and fall off their ladders. (¶ 19, Ex. 6)
97. Plaintiff landed on the floor before Officer Mitchell did. (¶ 20, Ex. 6)
98. Next, the officers in the hallway below the attic hole were attempting to get Plaintiff under control to place him in handcuffs, but Plaintiff was in the corner of the hall and appeared to be curling up and tightening his muscles to keep from being arrested. (¶ 21, Ex. 6) By then, Officer Mitchell was at the foot end of Plaintiff, keeping control of his legs so that Plaintiff would not kick. (¶ 21, Ex. 6)
99. Plaintiff was placed in handcuffs by Officer Petrilli and Officer Mitchell claims that he

did not kick Plaintiff or punch Plaintiff, nor did he observe any other officer do so. (¶¶ 22-23, Ex. 6)
100. In addition, Officer Mitchell did not observe any of the officers using unreasonable force and he has no knowledge of Plaintiff needing medical attention. (¶¶ 24-25, Ex. 6)

### G. Affidavit of Matthew J. Crane

101. Defendant Matthew Crane is a Sergeant with the Champaign Police Department and he was also called to the house at 1608 Williamsburg Drive on August 3, 2007 to assist the officers in connection with the arrest of Plaintiff for home invasion. (¶¶ 1-2, Exhibit 7, Affidavit of Matthew J. Crane)
102. Before he entered the house, Sgt. Crane loudly and clearly announced that he was from the Champaign Police Department, that he had a warrant and he ordered anyone inside of the house to come into a hallway with their hands up. (¶ 6, Ex. 7)
103. There being no response from inside the residence, Sgt. Crane and other officers entered the house. (¶ 6, Ex. 7)
104. Next, the officers opened the attic and called for Plaintiff to come out but there was no response. (¶ 9, Ex. 7)
105. Sgt. Crane and other officers used flashlights and chem lights but they could not see anyone in the attic or get a response, although they occasionally heard a noise in the ceiling and thus believed someone was in the attic. (¶ 10, Ex. 7)
106. Sgt. Crane decided to launch balls full of OC powder into the attic. (¶ 13, Ex. 7)
107. After launching the pepper balls, Plaintiff was heard coughing in the attic. (¶ 13, Ex. 7)
108. After hearing coughing, the officers called into the attic but got no response so Sgt. Crane used another can of OC spray and heard further coughing from the attic. (¶ 14, Ex. 7)
109. Sgt. Crane sprayed more OC spray into the attic and then Officer Mitchell and Sgt. Baltzell climbed portable ladders below the attic hole. (¶ 15, Ex. 7)
110. While Sgt. Baltzell was trying to engage Plaintiff in conversation, Crane heard Plaintiff yell something at which point multiple branches of a fake Christmas tree started coming through the attic opening and onto the officers. (¶ 15, Ex. 7)
111. Next, Plaintiff dove feet first into Sgt. Baltzell. (¶ 16, Ex. 7) Sgt. Crane had to use his arms to catch Sgt. Baltzell. (¶ 16, Ex. 7)
112. Plaintiff and Officer Mitchell landed on the floor in the hallway below the attic hole. (¶ 16, Ex. 7)
113. When Plaintiff landed on the floor, Crane observed that Plaintiff was struggling with three officers who were attempting to handcuff in a very small and confined space in the hallway. (¶ 17, Ex. 7)
114. Officer Thomas Petrilli placed Plaintiff in handcuffs. (¶ 18, Ex. 7)
115. After being handcuffed, Plaintiff was escorted out of the house and taken to Officer Mark McCabe's squad car on Williamsburg Drive. (¶ 19, Ex. 7)
116. Crane was not involved in the physical arrest of Plaintiff and did not observe any unreasonable force used by any of the arresting officers. (¶ 20, Ex. 7)

### H. Affidavit of Bradley J. Krauel

117. Bradley J. Krauel, who is not named as a Defendant, was a police officer with the Champaign Police Department on August 3, 2007 and arrived at 1608 Williamsburg Drive at approximately 10:00 p.m. after having been contacted by Sgts. Baltzell, Crane and Griffet to gather various equipment, including a mirror, less lethal OC spray, gas masks, pepper balls and ladders. (¶¶ 1-3, Exhibit 8, Affidavit of Bradley J. Krauel)
118. When Officer Krauel arrived at the scene, he was told by Sgt. Crane that Plaintiff was hiding in the attic so he brought his equipment into the house so that officers could attempt to see into the attic. (¶ 4, Ex. 8)
119. Many commands were made by the officers at the scene for Plaintiff to come to the opening of the attic with his hands showing but there was no response. (¶ 7, Ex. 8)
120. Because there was no response from Plaintiff, Sgt. Crane said out loud that if Plaintiff did not come down he was going to disperse OC spray into the attic. (¶ 8, Ex. 8)
121. Sgt. Crane began dispersing pepper balls into the attic. (¶ 9, Ex. 8)
122. Additional requests were made for Plaintiff to come to the opening of the attic but there was still no response. (¶ 10, Ex. 8)
123. Sgt. Crane then used OC spray and dispersed it into the attic at which point the police officers in the house donned gas masks. (¶ 11, Ex. 8)
124. After a short period of time, several coughs could be heard from Plaintiff in the attic. (¶ 12, Ex. 8)
125. Again, the officers commanded for Plaintiff to come to the opening and he began to approach. (¶ 13, Ex. 8)
126. As Plaintiff approached, Officer Krauel observed Plaintiff and told him to show his hands at which point Plaintiff started to come down the opening of the attic but then went back into the attic, turned around and spit saliva directly onto Krauel. (¶ 13, Ex. 8)
127. Additional OC spray was dispersed into the attic. (¶ 14, Ex. 8)
128. Sgt. Baltzell and Officer Mitchell then stood on folding ladders in an attempt to enter the attic but Plaintiff, who was chocking from the OC spray, approached Sgt. Baltzell and kicked debris at the officers. (¶ 15, Ex. 8)
129. Plaintiff then came through the opening to the attic hole, feet first, which knocked Officer Mitchell and Sgt. Baltzell off balance and off their ladders. (¶ 16, Ex. 8)
130. At that time, Krauel had been bracing Officer Mitchell on his ladder. (¶ 16, Ex. 8)
131. When Plaintiff began falling from the attic, Officer Krauel grabbed Plaintiff to prevent him from causing harm but Plaintiff, through his upper body strength, was able to break free from the officers. (¶ 17, Ex. 8)
132. While on the ground, officers tried to gain control of Plaintiff's arms but Plaintiff was attempting to keep his arms under his body and pushing up. (¶ 17, Ex. 8)

133. Despite Plaintiff's resistance, Officer Petrilli was able to place Plaintiff's arms into handcuffs. (¶ 18, Ex. 8)
134. At no time did Officer Krauel use unreasonable force nor did he observe any of the officers involved in the arrest of Plaintiff use unreasonable force. (¶ 20, Ex. 8) Krauel did not observe any of the officers punch Plaintiff or kick Plaintiff. (¶ 20, Ex. 8)

**G. Affidavit of Thomas Petrilli**

135. Defendant Thomas Petrilli is a patrol officer with the Champaign Police Department and was working with Sgt. David Griffet at 7:53 p.m. on August 3, 2007, when they spoke to a citizen who said that Plaintiff was currently at 1608 Williamsburg Drive. (¶¶ 1-2, Exhibit 9, Affidavit of Thomas Petrilli)
136. Officer Petrilli had also been involved in the attempted arrest of Plaintiff the day before, on August 2, 2007, at 1608 Williamsburg but Plaintiff fled the area on foot at that time and was not located. (¶ 3, Ex. 9)
137. After officers entered the house with a search warrant and arrested Scott Clark on an unrelated matter, Officer Petrilli noticed that the attic access panel in the hallway in the main level of the house appeared to have been disturbed and he also heard a noise similar to a board or other object falling in the attic. (¶¶ 8-10, Ex. 9)
138. The officers then opened the attic access panel and attempted to speak to Plaintiff but received no response although Petrilli again heard noise coming from the attic which was consistent with someone moving inside the attic. (¶ 11, Ex. 9)
139. After approximately 45 minutes of unsuccessfully attempting to talk Plaintiff into coming out of the attic, Sgt. Crane began deploying pepper spray into the attic. (¶ 12, Ex. 9)
140. After additional efforts to convince Plaintiff to exit the attic and further deployment of pepper spray, Plaintiff climbed towards the attic access hole but then quickly climbed back into the attic. (¶ 15, Ex. 9)
141. The officers continued to tell Plaintiff to come down so they could secure him in handcuffs. (¶ 16, Ex. 9)
142. Ultimately, Petrilli observed Plaintiff jump down out of the attic and onto the floor level and begin forcibly pushing into nearby officers. (¶ 17, Ex. 9)
143. Brown did not follow directions to get down on his knees and put his arms behind his back but the officers finally got Plaintiff onto the floor, handcuffed and removed him from the house. (¶¶ 18-20, Ex. 9)
144. Petrilli affies that at no time during the arrest of Plaintiff did Petrilli use unreasonable force or observe unreasonable force and at no time did he observe Plaintiff being kicked or punched in his ribs. (¶ 23, Ex. 9)

**H. Affidavit of Douglas Kimme**

145. Defendant Douglas Kimme is a police officer with the Champaign Police Department and on August 3, 2009 he and other police officers were looking for Plaintiff, a home invasion/robbery suspect, at 1608 Williamsburg. (¶ 1, Exhibit 10, Affidavit of Douglas Kimme)
146. Although Officer Kimme entered 1608 Williamsburg after a search warrant was procured by Sgt. David Griffet, he left the house prior to OC spray being deployed because he did not have a gas mask. (¶ 2, Ex. 10)
147. Officer Kimme was not inside the house when Plaintiff exited the attic and was not involved in the physical arrest of Plaintiff. (¶ 3, Ex. 10)
148. Because Officer Kimme was not inside the house when Plaintiff was arrested and handcuffed, he has no knowledge of any unreasonable force being used in connection with the arrest and handcuffing of Plaintiff. (¶ 4, Ex. 10)

149. Officer Kimme did not see Plaintiff until Plaintiff exited the house and was already handcuffed. (¶ 5, Ex. 10)
150. Kimme has no knowledge of Plaintiff needing medical attention and based on his observations of Plaintiff, he believes Plaintiff did not have any medical needs at any time on August 3, 2007. (¶ 6, Ex. 10)

**I. Affidavit of Jamie Bowersock**

151. Defendant Jamie Bowersock is a police officer with the Champaign Police Department and he was outside the house at 1608 Williamsburg on August 3, 2007 when Plaintiff was arrested inside the house. (¶¶ 2-3, Exhibit 11, Affidavit of Jamie Bowersock)
152. Bowersock was not involved with the physical arrest of Plaintiff or the handcuffing of Plaintiff because he was outside the house and did not see Plaintiff until officers brought Plaintiff outside of the house, in handcuffs, to be placed in a squad car. (¶¶ 4-5, Ex. 11)
153. Bowersock was not involved in transporting Plaintiff from 1608 Williamsburg to the Champaign police station. (¶ 6, Ex. 11)
154. Officer Bowersock, together with Officer John Lieb, later transported Plaintiff from the Champaign police station to the Champaign County satellite jail. (¶ 7, Ex. 11)
155. Officer Bowersock did not observe any unreasonable force in connection with the arrest of Plaintiff because he was outside of the house and, further, Officer Bowersock affies she has no knowledge of Plaintiff needing medical attention after his arrest. (¶ 8, Ex. 11)

**J. Affidavit of Brenda Richards**

156. Brenda Richards is a Deputy Sheriff of Champaign County. (¶ 1, Exhibit 12, Affidavit of Brenda Richards)
157. On August 4, 2007, Deputy Richards was working as an intake officer at the Champaign County Sheriff's Office Satellite Jail at 502 S. Lierman, Urbana, Illinois at which time she handled the booking of Plaintiff. (¶ 2, Ex. 12)
158. Deputy Richards completed a 3-page document entitled "INITIAL CLASSIFICATION LISTING" which states that Plaintiff did not have any visible signs of trauma, bruises, shortness of breath or injuries. (¶ 3, Ex. 12)
159. Deputy Richards had an opportunity to observe Plaintiff on August 4, 2007 and her observation was that Plaintiff had no visible signs of trauma or bruises. (¶ 7, Ex. 12)

160. Deputy Richards was also unaware of Plaintiff needing medical assistance as of August 4, 2007, and she had no knowledge of Plaintiff having any type of serious medical need at that time. (¶ 8, Ex. 12)

Plaintiff, in his response to Defendant's motion for summary judgment, does not dispute any of the Defendants' undisputed statement of materials facts, nor does he present any additional material facts by way of the format called for by Local Rule 7.1(D)(2)(b)(4). Under paragraph 2 of his response, however, Plaintiff contends that he "filed with his complaint sworn affidavits

from witness [sic] to support his claim."  Actually, Plaintiff submitted the "Affidavit" of Wanda Hampton and the "Affidavit" of Scott Clark with his "Motion for Summary Judgment," filed on February 26, 2009 [19].  On March 9, 2009, this court entered a text order finding that Plaintiff's document filed as a Motion for Summary Judgment" was merely his response to Defendants' answer and as such ruled that the motion was moot.  Regardless, their affidavits" must be disregarded because neither document is notarized.  Plaintiff, under paragraph 4 of his response, states that he "has filed with the court a statement from his current attending doctor, Mrs. Francis…" and copy of this "memorandum" dated May 12, 2009 is attached to Plaintiff's response.  First, Plaintiff has not laid the proper foundation for the court to consider any statement made by Mrs. Francis. Second, Mrs. Francis' memorandum merely indicates that she diagnosed Plaintiff with post traumatic stress disorder more than one year after the alleged occurrence in this case, but his alleged condition is "**secondary to his reports of being abused while in County custody**." (emphasis added)  The Defendants, of course, were employed by the City of Champaign at the time of the alleged occurrence and were not employed by the County of Champaign where Plaintiff was taken after his arrest for booking.  Plaintiff remained in county custody for one year after his arrest at which time he was transferred to the Vienna Correctional Center. (pp. 6-7, Exhibit A, Motion for Summary Judgment)

Discussion and Conclusion

Plaintiff claims that: (1) he was subjected to unreasonable force, (2) there was failure to intervene by the officers to prevent unreasonable force and (3) the officers showed deliberate indifference to a serious medical need.  In his complaint Plaintiff claims he suffered from broken or cracked ribs and had difficulty breathing.

First, as to the plaintiff's excessive force and failure to protect claims, the defendants, Griffett, Bowersock and Kimme are entitled to and granted summary judgment.  An individual is liable under § 1983 only if he or she was "'personally responsible for the deprivation of a constitutional right.'" *Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001), *citing Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001); and *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).  Personal responsibility means participating directly in the constitutional violation or directing the unconstitutional conduct.  Here, Griffett, Bowersock, Kimmie and Lieb all state that they were not in the house during the plaintiff's arrest and therefore could not have been involved in the alleged excessive force  and would not have been in a position to intervene.

Further, these defendants state they did not see the plaintiff until after he was brought outside.  The plaintiff does not dispute these facts.

Second, as to the plaintiff's claim that the defendants, Petrilli, Baltzell, Mitchell, Crane and Kimmie were deliberately indifferent to his serious medical needs, the plaintiff has placed nothing in the record that indicates that he made a request for medical care from any of these defendants.  Further, there is absolutely nothing in the record that indicates Petrilli, Baltzell, Mitchell, Crane and Kimmie were aware of any medical concerns by the plaintiff.  Therefore,

12

these defendants are entitled to summary judgment on the plaintiff's claim of deliberate indifference to a serious medical needd.  See *Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001), *citing Chavez v. Illinois State Police*, 251 F.3d 612, 652 (7th Cir. 2001); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Further, Plaintiff cannot prevail on his claim of deliberate indifference to a serious medical need unless he can prove that he had an objectively serious injury or medical need that was deprived and that the Defendant officers knew that the risk of injury was substantial but nevertheless failed to take reasonable measures to prevent it.  *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) and *Chavez v. Cady*, 207 F.3d 901, 904 (7th Cir. 2000).  An objectively serious injury or medical need must be diagnosed by a medical doctor as requiring treatment or "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Chapman*, 241 F.3d at 845, *quoting from Zentmyer v. Kendall County*, 220 F.3d 810 (7th Cir. 2000) and *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).  An objectively serious medical condition may exist if omission of treatment could "result in further significant injury or unnecessary and wanton infliction of pain."  *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting from Gutierrez*, 111 F.3d at 1373.  An officer who is negligent or even grossly negligent is not necessarily deliberately indifferent.  *Chapman*, 241 at 845.  A plaintiff, thus, must show that an officer "was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed to the prisoner's health or safety."  *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001).  Hence, deliberate indifference is more than negligence or gross negligence and it approaches intentional wrongdoing or criminal recklessness.  *Id*.

In *Tucker v. Randall*, 948 F.2d 388 (7th Cir. 1991), the court held that deliberate non-treatment of broken ribs and a broken hand for 9 -1/2 months, resulting in permanent deformities, presents a clear Eighth Amendment violation.  In Tucker, the plaintiff was arrested after a physical altercation.  After his arrest, plaintiff was taken to a hospital, where blood was washed from his face but no x-rays were taken of his broken right hand and broken lower right ribs. He was detained in jail where he requested treatment for his lower right ribs and mangled right hand but defendants refused to take him to a doctor. While in solitary confinement he lost 40 pounds because of insufficient food.  After 67 days the jail chaplain told defendants that he would complain to the newspapers on plaintiff's behalf unless they removed him from solitary confinement, gave him a razor and took him to a doctor.  Plaintiff was then taken to a pediatrician, who said that plaintiff's ribs and mangled hand required a bone specialist and therefore he could not treat them.  As a result, plaintiff's right hand was too mangled to be of practical use and his lower right ribs protrude an inch from his rib cage. He received no medical treatment for those injuries during his 9 1/2 months' incarceration in the Kendall County jail.

In *Rambo v. Daley*, 68 F.3d 203, (7th Cir 1995), police beat up the plaintiff resulting in broken ribs.  In *Rambo,* the defendants argued before the Seventh Circuit Court of Appeals that the plaintiff had no proof of a significant injury because he had no proof that his ribs were broken.  The defendants also argued that the plaintiff had failed to produce competent evidence of his broken ribs. In *Rambo*, the plaintiff had submitted an affidavit stating that he sustained

broken ribs and an unauthenticated medical bill documenting his treatment for broken ribs. The defendants argued that the evidence was insufficient to support the district court's finding, for purposes of summary judgment, that the plaintiff suffered broken ribs. The *Rambo* Court held that the Constitution clearly does not allow police officers to force a handcuffed, passive suspect into a squad car by breaking his ribs. The Court further stated that the defendants' argument rested completely on the alleged failure of the plaintiff to produce competent evidence of his broken ribs and that the essential dispute, therefore, concerns whether the plaintiff's version of the facts is true. The Court determined that was a factual questions for the district court to resolve.

In the instant case, Defendants argue that the Plaintiff himself offers no evidence to support his claim that he suffered from either cracked or broken ribs or that he had problems breathing following the deployment of the OC spray. Nor does the Plaintiff dispute the Defendants' facts wherein they assert they observed no visible injuries on the Plaintiff. This case is unlike *Tucker* and *Rambo*. Here, the plaintiff does not provide any evidence to support his claim that he suffered from either cracked or broken ribs or that he had problems breathing. The Plaintiff points to nothing that could support a finding that the plaintiff suffered from any serious medical need during or after his arrest on August 4, 2007. Therefore, the defendants, Griffit and Bowersock also cannot be found to be liable for the plaintiff's deliberate indifference to serious medical claim.

A claim that a police officer has used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a citizen is addressed to the reasonableness of the seizure, under the standards established by the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Abdullahi v. City of Madison,* 423 F.3d 763, 768 (7th Cir.2005). An officer's use of force is unreasonable from a constitutional point of view only if, "judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Lester v. City of Chicago,* 830 F.2d 706, 713 (7th Cir.1987). The reasonableness inquiry involves a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks omitted). We must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* We also bear in mind that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. 1865. A factual inquiry into an excessive force claim "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom...." *Abdullahi,* 423 F.3d at 773 (internal quotation marks omitted).

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Saucier v. Katz*, 121 s.Ct. 2151 2160 (2001). Whether a given physical encounter between a police officer and an arrestee will be held to violate the Fourth Amendment's

prohibition on excessive force depends upon the factual circumstances of the case in question. Toward this end, the Court in *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467 (7th Cir. 1997) held that in order to determine whether the force an officer used was excessive, "we look at the circumstances the officer was confronted with, not the 20/20 vision of hindsight, but through the more immediate perspective of a reasonable officer on the scene. *Lanigan*, 110 F.3d at 475 (*quoting Flazell v.* Flanigan, 102 F.3d 877, 883 (7th Cir. 1996).

As to the use of pepper spray and OC balls, the plaintiff does not specifically allege that the defendants unjustifiably used pepper spray or OC balls to effectuate his arrest. However, even if that is his intention, the court disagrees with the plaintiff. The court finds that the undisputed facts demonstrate that the use of the OC and pepper spray was objectively reasonable. It is undisputed that Plaintiff, Charles Brown was wanted for robbery/home invasion. The day before his arrest, Plaintiff fled when approached by Sergeant Griffet and Officer Petrilli. On the day of Plaintiff's arrest, he hid in an attic for over 2 hours so as to avoid the police. Plaintiff knew the police were in the house. The officers had announced their presence and their warrant. The officers made numerous requests for Plaintiff to exit the attic, but he failed to do so. After requesting that Plaintiff exit the attic for 45 minutes, the officers were forced to launch pepper balls and then deploy OC spray into the attic. Even this approach did not initially result in Plaintiff coming out of the attic. When Sgt. Baltzell and Officer Mitchell stuck their heads into the attic, Plaintiff attempted to go further from the opening. Ultimately, Plaintiff, who could not see, finally came out of the attic and officers were able to effectuate the arrest of the plaintiff. The use of the mace was a legitimate means of compelling compliance with a direct order by the police for the Plaintiff to come out of the attic. Therefore, Defendants are entitled to summary judgment as a matter of law for any claims of excessive force for use of the pepper spray and OC balls

Now the court considers the Plaintiff's claims that the defendants used excessive force against him when they punched him in the ribs and his side and that the Defendants failed to intervene and protect him from the use of excessive force. It is undisputed that the only defendants present during the alleged assault against the plaintiff are Thomas Petrilli, Dennis Baltzell, Rodney Mitchell and Matthew Crane. In his complaint, the Plaintiff claims that someone punched him in the ribs before he was completely out of the attic and someone punched him in the ribs and kicked him in the left side after he was handcuffed. In the Undisputed Statement of Material Facts, Baltzell, Mitchell and Petrilli deny that they punched or kicked the Plaintiff. Cranes states that he was not involved in the physical arrest of the Plaintiff. Baltzell, Mitchell, Petrilli and Crane state that they did not observe any Defendant punch or kick the Plaintiff and further they did not observe any officer use any unreasonable force. In his response, the Plaintiff does not dispute these facts by way of the format called for by Local Rule 7.1(D)(2)(b)(4) or in his argument. Plaintiff simply argues there are genuine issues of material facts in this case and that it should proceed to trial. However, the Plaintiff bears the burden to respond. He cannot simply rest on his complaint. He is required to set out specific facts showing a genuine issue for trial. Now is the put up or shut up moment in this lawsuit. The Plaintiff is required to show what evidence he has that would convince a trier of fact to accept his version of events. Plaintiff simply did not meet his burden. Plaintiff's argument sets forth the elements

15

necessary to prove a common law claim for negligence under Illinois law.  This case, however, is limited to § 1983 civil rights claims against the various Defendants.  The Defendant officers, in their motion for summary judgment, set forth 160 undisputed material facts and Plaintiff has failed to respond to any of those facts.  In the argument section of their motion, the Defendant officers explain why, based on the undisputed facts, they did not violate Plaintiff's civil rights and why they are each entitled to summary judgment.   Having considered the Undisputed Material Facts, the court finds that the Defendants are entitled to summary judgment on the Plaintiff's claims of excessive force and failure to protect.

Based on the foregoing:

1. Pursuant to Fed. R. Civ. Pro. Rule 56, the Defendants' summary judgment motion [38] is granted.  The clerk of the court is directed to entered judgment in favor of the Defendants and against the Plaintiff.  This case is terminated in its entirety.
2. If the plaintiff wishes to appeal this dismissal, he must file a notice of appeal with this court **within 30 days of the entry of judgment**.  Fed. R. App. P. 4(a)(4).  A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal.  *See* Fed. R. App. P. 24(a)(1)(C).  If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal.  Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).

Enter this    22nd      day of February 2010.


/s/ Michael P. McCuskey
_____
Michael P. McCuskey
Chief United States District Judge